UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BRINK FIDLER and JUSTIN FOX, | ) |
| Plaintiffs, | ) ) ) |
| v. | ) No. 3:16-cv-02591 ) CHIEF JUDGE CRENSHAW |
| THE TWENTIETH JUDICIAL DISTRICT DRUG TASK FORCE, | ) ) ) |
| Defendant. | ) ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Brink Fidler and Justin Fox were agents of the Twentieth Judicial District Task Force (the "Task Force") when it dissolved in 2015. Fidler, the Director of the Task Force, requested from the Board of Directors (the "Board") that he and Fox be compensated for their respective accrued compensatory time, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(o). The Board denied that request, and this action commenced. The Court previously granted summary judgment to Fox for compensatory damages. (Doc. No. 66.)

The Court held a two-day bench trial on June 5 and 6, 2018. (Doc. Nos. 94, 95.) Three issues were presented at trial: (1) whether Fidler was an exempt employee under the FLSA; (2) if Fidler is not an exempt employee, the amount of compensatory time that Fidler accrued; and (3) whether either Fidler or Fox, or both, is entitled to liquidated damages. (Doc. No. 80 at 4.) For the reasons that follow, the Court concludes that Fidler is an exempt employee and is not entitled to compensation for his accrued compensatory time. The Court further concludes that the Task Force did not prove by a preponderance of the evidence that it acted in good faith in denying Fox's

request for compensation for accrued compensatory time, and therefore Fox is entitled to liquidated damages in an amount equal to his compensatory damages.

I.  Findings of Fact

The Task Force was an inter-agency law enforcement organization governed by an Inter-Agency Agreement from July 1, 2014 until July 1, 2015. (Doc. No. 77 at 1.) Its primary objective was to identify, arrest and prosecute those responsible for the sale and distribution of substantial quantities of controlled substances within the Twentieth Judicial District. (Id.) The Board controlled the direction of the Task Force. (Id.) The Board consisted of the Chief of Police (the "Chief") of the Metropolitan Nashville Police Department (the "Police Department"), the District Attorney of the Twentieth Judicial District (the "District Attorney"), and the Director. (Id. at 2.) When the Board made decisions, each board member had one vote and a simple majority prevailed. (Id.)

The regular work hours for Task Force agents was forty-three hours per week. (Id.) All employees at the Task Force were permitted to accrue compensatory time at a rate of one-and-a-half hours worked in excess of the employee's regular work period and utilize that time as paid time off. (Id.) Task Force agents often worked more than the forty-three hours per week, and each kept his own time tracking those hours. (Doc. No. 94 at 23-24.)

A. Fidler's Duties

Fidler served as the Director from July 1, 2014, until June 30, 2015. (Doc. No. 77 at 2.) Prior to becoming the Director, he served as a Sergeant for the Police Department and was assigned to the Task Force. (Doc. No. 94 at 13.) With the appointment, Fidler received a raise from approximately $66,000 per year to approximately $94,000, which was $44.913 per hour and more than $455 per week. (Id. at 57, 121; Doc. No. 95 at 4.) According to the Inter-Agency Agreement,

the Director's duties "consist[ed] of the implementation of policies and procedures developed by [the Board] as well as the day-to-day operation of the task force and the general direction of investigations." (P.'s Ex. 1 at 2.) The Inter-Agency Agreement required the Director to "report on a regular basis to [the Board], the status of the task force operation, information concerning the effectiveness of the unit and any other pertinent information." (Id.) The Inter-Agency Agreement also gave the Director authority to require Task Force employees to submit to drug testing or truth verification analysis. (Doc. No. 95 at 7.) Fidler testified that he completed the tasks as described in the Inter-Agency Agreement. (Doc. No. 94 at 105-06, 121-22.)

Fidler also testified that some of the duties he performed were as a Task Force agent. The Task Force used several techniques to investigate drug crimes, including physical surveillance, electronic surveillance, wiretaps, undercover buy operations, buy takedowns, search warrants, and utilizing confidential informants. (Id. at 15.) Fidler, as Director, chose to follow in the former-Director's footsteps and participate in all law enforcement activities of the Task Force. (Id. at 19, 22-23; Doc. No. 95 at 233.) Fidler assisted with making arrests, obtaining search warrants, takedowns, obtaining and listening to wiretaps, and covert missions.[1] (Doc. No. 94 at 19.) Specifically, Fidler supervised, directed, and participated in complex maneuvers, such as a "vehicle jam" and a "stack."[2] (Id. at 66-67.) Fidler's testimony was consistent with District

---

[1] Fidler testified that it was not a choice to assist with these law enforcement activities because of the small size of the Task Force and complexity of investigations. (Doc. No. 94 at 65.) He further testified that there was "really no way to supervise the day-to-day operations of a unit like this without being alongside the operation itself and conducting those same activities yourself." (Id. at 65-66, 68.) While it is possible that Fidler did not believe that he, personally, did not have the choice to participate in investigations, the Court finds that the Director, a management position, had complete control over what he chose to do on a daily basis.

[2] A "vehicle jam" is where an officer behind a stopped suspect vehicle makes contact with the rear of the suspect vehicle, another driver makes contact with the front of the suspect vehicle, and a third driver blocks the driver's door to prevent the suspect from fleeing. (Doc. No. 94 at 67, 69.) Fidler chose to be in one of the contact vehicles because he had a Chevy Tahoe, which was one of the largest vehicles owned by the Task Force. (Id.) A "stack" is where officers line up right outside the door as they prepare to breach the door. (Id.) As an officer, Fidler was the lead person in the stack; but as Director, he chose to be the fourth officer in the stack so he could supervise the operation. (Id.)

Attorney Glenn Funk's in this regard. Funk testified that Fidler "was an administrator who would also get in the trenches and wasn't asking anybody else to do things that he wasn't at least willing to do himself." (Doc. No. 95 at 226.) Funk agreed that Fidler often joined "the guys on his team to do some of these investigations." (Id.)

Fidler's management style was inclusive by choice. When a Task Force agent came to Fidler with case information, he would discuss the case with the agent and they would make a "team decision" on what direction to take the case. (Id. at 38; Doc. No. 94 at 21-22.) However, if Fidler disagreed with the agent's recommendations, Fidler had the authority to direct the agent to conduct the investigation in the manner Fidler desired. (Doc. No. 94 at 125.) If an agent or Metropolitan Nashville ("Metro") Police officer assigned to the Task Force did not know what to do, Fidler had the authority to direct his duties and responsibilities, although that rarely happened. (Id. at 126.) He discussed the cases with his agents almost daily. (Id. at 72.)

Fidler also performed a variety of managerial tasks in his capacity as Director. For example, prior to the Board meetings, Fidler typically drafted the agenda and the anticipated minutes and circulated them to the Board, the Task Force's Chief Financial Officer Michael Brook, and others. (Id. at 56; Doc. No. 95 at 97.) After the Board meeting, Fidler would circulate the final minutes to the Chief and District Attorney for their signatures. (Doc. No. 94 at 56.) Fidler drafted the policies and procedures of the Task Force and presented them to the Board for approval. (Id. at 105.) When wiretaps took agents into other jurisdictions, Fidler would coordinate with the local and federal law enforcement agencies in the other jurisdictions for surveillance. (Id. at 21.) If an investigation with another organization resulted in a fine, forfeiture, or seizure, Fidler would negotiate the terms of splitting the money between the organizations and present the terms of the agreement to the Board for approval. (Doc. No. 95 at 10, 196.)

4

Again, Funk testified consistently with Fidler in this regard. Funk testified that Fidler was responsible for "approving which individuals should be investigated, approving the scope of the investigations, the durations of the wiretaps, whether officers were going to be tasked to be sent out to do surveillance or set up pole [cameras] or do any of the other types of traditional police investigative work." (Id. at 192.) Funk also explained that he expected Fidler to manage the Task Force employees' time "and make sure that the resources that had been provided to this Task Force were being used in an efficient and effective manner." (Id.) Funk expressed his view that Fidler's most important task as Director was to "supervise the operations of the Task Force in order to properly investigate and develop evidence against major narcotics dealers and drug organizations in Davidson County." (Id. at 199.)

Fidler, as the Director, was in charge of managing the Task Force employees. He was on the panel responsible for interviewing job applicants, and as a Board member he would have a vote on whether to hire that applicant. (Doc. No. 94 at 131-32.) His opinion would carry weight with the Chief and District Attorney. (Id. at 132.) Fidler was also responsible with ensuring that agents were properly trained. (Id. at 134-35.) Typically, a senior agent of the Task Force would pair up with a junior agent without any direction by Fidler. (Id. at 135; Doc. No. 95 at 233.) Fidler recommended a salary for new employees, and presented his recommendation to the Board for approval. (Doc. No. 94 at 137; Doc. No. 95 at 223.) Likewise, he would bring unethical behavior by Task Force employees to the Board's attention so that the Board could take corrective action. (Doc. No. 95 at 6.)

Fidler was in charge of ensuring that the Task Force had sufficient supplies to carry out its duties. (Id. at 232.) If the Task Force needed to purchase an item that was under $500.00, Fidler was authorized to purchase it without Board approval. (Id. at 14.)

5

Fox told Fidler exactly what Fox was doing "to keep him aware of what is going on because he is my boss." (Id. at 39.) When Fox received a drug complaint, conducted surveillance, executed search warrants, or did any other law enforcement activities, he would either seek Fidler's input or Fidler would be involved in the execution of those activities. (Id. at 39-40.)

    B. Dissolution of the Task Force

On June 4, 2015, and in preparation of the Task Force terminating, Fidler sent an exhaustive email to the Chief, Funk, and Assistant District Attorney Edward Ryan regarding some issues the Task Force needed to resolve under a proposal that it be absorbed into the Police Department. (Id. at 17; P.'s Ex. 23.) Fidler discussed statutory issues with keeping three of the Task Force agents employed by the District Attorney's office as investigators rather than transferring them to the Police Department. (P.'s Ex. 23 at 1.) He also discussed the cost of overtime to agents, including one time in which the Task Force paid $40,000 in overtime to Police Department agents assigned to the Task Force for conducting a large takedown involving dozens of officers. (Id.) He informed the members of the Board of the high and necessary cost of maintaining the wiretap room. (Id.) Fidler raised concerns that fines collected from prosecutions by the Task Force when the Task Force was a department within the Police Department would not be able to be used by the Task Force but instead by the drug court, which could put a strain on funding the Task Force operations. (Id.) He praised his agents for the Task Force's system of keeping track of seized property, acclaiming that they have passed every audit, and recommended that the Police Department keep the Task Force's system in place. (Id. at 1-2.) Fidler raised concerns with the requirement in the Inter-Agency Agreement regarding what to do with its seized property when the Task Force ceases to exist, and discussed that perhaps the Board needed to amend that provision. (Id. at 2.) Finally, he raised the issue of compensation for his and Fox's unused compensatory and vacation time.

6

(Id.) Fidler testified that he sent the email because there were "a lot of daily details and housekeeping issues that if they're not there every day they wouldn't know about." (Doc. No. 95 at 18.)

At the final Board meeting on June 30, 2015, Fidler presented his and Fox's requests for compensation for their accrued compensatory time to the Board. (Doc. No. 95 at 204.) After the Board meeting, Fidler drafted the minutes from the meeting and indicated that his and Fox's requests were approved. (Doc. No. 94 at 55-56; P.'s Ex. 10.) Only Fidler signed the minutes. (Doc. No. 95 at 204; P.'s Ex. 10.) Instead of signing, Funk took Fidler to Brook's office to determine whether Fidler and Fox were entitled to compensation for their accrued compensatory time. (Doc. No. 95 at 103-04.)

    C. The Task Force's FLSA Investigation

Fidler provided Brook with the unsigned Board minutes and copies of his and Fox's time sheets, which they kept in excel spreadsheets at Fidler's direction. (Doc. No. 95 at 103.) Brook emailed Metro Human Resources Payroll Supervisor Tara Stewart for an opinion regarding whether Fidler and Fox were entitled to compensation. (Id. at 105.) Stewart does not conduct FLSA investigations (Id. at 135), so she contacted Metro's Assistant Director of Human Sources Michael Taylor, her boss, with Brook's question. (Id. at 145.) Stewart also responded to Brook's question that Fidler and Fox "were functioning in top level [management] positions and therefore [would not] be eligible for [compensatory] time." (P.'s Ex. 15 at 2.) Stewart testified that she made this initial determination because Metro classified both employees as "exempt." (Doc. No. 95 at 139.)

Fidler also called Justin Stack, who worked in the Metro Human Resources office that Fidler knew personally, about compensation, who referred him to Taylor. (Doc. No. 94 at 87.) Taylor's job included providing information to clients regarding overtime compensation. (Doc.

7

No. 95 at 165.) He is a certified human resource professional through the Human Resource Certification Institute and is a senior competency professional. (Id.) He also spearheaded Metro's effort to update their FLSA regulations after the Department of Labor revised the standards in 2004. (Id. at 166.)

Taylor directed Patrick Kennedy, who at the time was a Metro Human Resources employee supervised by Taylor (Doc. No. 95 at 170), to call Fidler to discuss Fidler's job duties. (Doc. No. 94 at 87.) Taylor supervised Kennedy's FLSA investigation because it was Kennedy's first. (Doc. No. 95 at 170.) No one from Metro Human Resources asked about Fox's claim for compensation (Doc. No. 94 at 88) or contacted Fox about his request for compensation (Doc. No. 95 at 33).

On September 2, 2015, Brook sent the Board a Memorandum that he preliminarily concluded that neither Fidler nor Fox were eligible to be compensated for their accrued compensatory time. (Id. at 56, 106; P.'s Ex. 16.) In his analysis, he included that both employees were in "FLSA Exempt" classifications and that Metro Human Resources concluded that both employees "were functioning in top level management classifications." (P.'s Ex. 16 at 11.) On October 20, 2015, Kennedy sent to Brook Kennedy's Metro Human Resources Memorandum concluding that Fidler was not eligible for compensation. (Doc. No. 95 at 121; P.'s Ex. 17.) Taylor testified that he reviewed and approved Kennedy's Memorandum. (Doc. No. 95 at 170.) Taylor further testified that he relied primarily on Fidler's description of his job duties when Kennedy interviewed Fidler because Kennedy did not interview anyone else. (Id. at 175.) The findings did not include Fox's request for compensation. (Id. at 121; P.'s Ex. 17.) Taylor testified that he did not investigate Fox's request. (Doc. No. 95 at 180.)

II.   Violation of Court Order

At the conclusion of the first day of trial, Fidler was still on the witness stand testifying on cross-examination. The Court instructed Fidler: "we're going to recess for the day, but I instruct you not to have any conversations with anyone about your past testimony or anticipated future testimony until we resume cross-examination." (Doc. No. 94 at 139.) Fidler responded, "Yes, sir." (Id.) Fidler further stated he had no questions about that instruction. (Id.)

The next day, after cross-examination finished, Fidler's counsel asked Fidler on re-direct, "Did you look up anything last night to determine what [Phillip Taylor's] classification was?"[3] (Doc. No. 95 at 18.) Fidler responded that he looked at the State of Tennessee's website and saw that Taylor was classified as a "DA Drug Task Force Agent." (Id.) The Court asked why he looked up information regarding what he previously testified when the Court explicitly told him not to, and he responded that he "just wanted verification [to back up my claim] to bring to court today." (Id. at 19.) Fidler informed the Court that he looked up Taylor's position on the State's website the previous night and emailed it to his counsel the next morning. (Id.) Counsel then discussed the screenshot with Fidler prior to starting day two of the trial. (Id. at 20-21.) After hearing argument, the Court stated from the bench, "I'm going to take the violation of my instructions into consideration when I determine his credibility and his testimony." (Id. at 24.)

The Supreme Court has previously discussed the problem of allowing a witness who is testifying on cross-examination to discuss his testimony with counsel during breaks in the trial. It found that it "is a common practice for a judge to instruct a witness not to discuss his or her testimony with third parties until the trial is completed." Perry v. Leeke, 488 U.S. 272, 281 (1989). It held that it is "entirely appropriate for a trial judge to decide, after listening to the direct examination of any witness, . . . that cross-examination is more likely to elicit truthful responses

---

[3] This was in response to an irrelevant controversy the parties had regarding whether the Task Force had four or five agents. The Pretrial Order did not preserve any issue regarding the size of the Task Force. (Doc. No. 80 at 4.)

9

if it goes forward without allowing the witness an opportunity to consult with third parties, including his or her lawyer." Id. at 282. This is true even if the witness is not attempting to deceive the Court: "it is simply an empirical predicate of our system of adversary rather than inquisitorial justice that cross-examination is more likely to lead to the discovery of truth than is cross-examination of a witness who is given time to pause and consult with his attorney." Id. at 282.

While the issue Fidler discussed with his attorney was utterly irrelevant to the trial, it does reflect on Fidler's credibility. The Court does not find that Fidler was intentionally attempting to deceive the Court. However, it shows that Fidler wanted to win and was willing to push boundaries in order to win. This is reflected in testimony in which it appeared Fidler embellished and exaggerated his law enforcement work while downplaying and diminishing his managerial work. The Court has considered Fidler's embellishments when making its findings of fact.

### III. Conclusions of Law

By a preponderance of the evidence, the Court concludes that Fidler was an exempt employee under the FLSA and that Fox is entitled to liquidated damages.

### A. Fidler

An exempt employee is defined as "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). If an employee is exempt, the provisions under 29 U.S.C. § 207, including compensating an employee for unused compensatory time, do not apply.[4] Id. An employee is employed in a "bona fide executive capacity" if he (1) is compensated at a rate of not less than $455.00 per week; (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or

---

[4] The Task Force proposes a conclusion of law that the exemption is to be construed narrowly. (Doc. No. 97 at 3 (citing Martin v. Ind. Mich. Power Co., 381 F.3d 574, 578 (6th Cir. 2004))). The Supreme Court rejected that statement of the law, but instead held that any FLSA exemption should be given "a fair (rather than a 'narrow') interpretation." Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018) (citing reference omitted).

10

Case 3:16-cv-02591  Document 103  Filed 09/17/18  Page 10 of 16 PageID #: 1980

subdivision thereof; (3) who customarily and regularly directs the work of two or more employees; and (4) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a) (effective June 30, 2014). It is not disputed that the Task Force paid Fidler a salary of more than $455 per week.

1. Primary Duty

An employee's "primary duty" is defined as the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The regulations require the Court emphasize "the character of the employee's job as a whole." Id. Factors for the Court to consider regarding Fidler's primary duty include "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and wages paid to other employees for the kind of nonexempt work performed by the employee." Id.

The first responder regulation states that the exemptions in in 29 U.S.C. § 213 do not apply to "police officers, detectives, . . . and similar employees, regardless of rank or pay level, who perform work such as . . . preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or similar work." 29 C.F.R. § 541.3(b)(1). The first responder regulation "does not supplant the primary duty test in determining whether a particular first responder is exempt." Morrison v. Cty. of Fairfax, VA, 826 F.3d 758, 767 (4th Cir. 2016). Thus, high level employees who perform some first responder duties, like police lieutenants or fire chiefs, can nonetheless be exempt executives

11

if their primary duty is managerial and they meet the other elements of the test. Maestas v. Day & Zimmerman, LLC, 664 F.3d 822, 827 (10th Cir. 2012).

First responders' "primary duty is not management of the enterprise in which the employee is employed," and merely because a first responder may "also direct[ ] the work of other employees in the conduct of an investigation" does not make the officer's primary duty executive. 29 C.F.R. § 541.3(b)(2). "[S]ome duties performed by high-ranking public safety officers are bona fide managerial duties, such as: 'evaluating personnel performance,' 'making recommendations as to hiring, promotion, discipline, or termination,' 'coordinating and implementing training programs,' 'maintaining inventory of property and supplies,' 'maintaining operational readiness through supervision and inspection of personnel, equipment, and quarters,' 'deciding how and where to allocate personnel,' and 'directing operations' at emergency scenes, 'including deciding whether additional personnel or equipment is needed.'" Maestas, 664 F.3d at 829 (citing Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122, 22130 (Apr. 23, 2004)).

Here, the Court finds by a preponderance of the evidence that Fidler performed all of the "bona fide managerial duties" outlined in Maestas. And while it is true that Fidler also performed law enforcement duties, the Court finds that the performance of the bona fide managerial duties was more important than his first responder duties. Persuasive to the Court is that there was no one else at the Task Force who could perform the managerial duties other than Fidler. In Morrison, the Fourth Circuit found that the fire captains would have to leave any managerial work they were performing in order to respond to a fire because a fire truck could not leave without its captain. 826 F.3d at 769-70. The opposite is true here. The first responder tasks could be completed with

12

or without Fidler, but only Fidler was responsible for completing the managerial tasks.[5] Fidler testified numerous times that all Task Force agents were well-qualified and could perform the complex law enforcement tasks. However, he—and only he—was required to determine what equipment the agents needed; direct operations and determine whether additional personnel was needed; if additional personnel was needed, coordinate with other jurisdictions; allocate the split of money; and much more.

There is no better example of the importance of Fidler's managerial job duties than his exhaustive June 4, 2018 email preparing for the dissolution of the Task Force. (P.'s Ex. 23.) This email exemplified Fidler's knowledge and appreciation of the intricate statutes involved with asset forfeiture. It also shows that Fidler knew what his employees were doing in all aspects of their jobs, including inventorying property. It last, but certainly not least, shows that Fidler knew about how the Task Force's money worked and that Fidler was heavily involved in ensuring that the Task Force had sufficient funds to continue operations. Fidler's testimony that he sent the email because there were "a lot of daily details and housekeeping issues that if they're not there every day they wouldn't know about" shows that without Fidler, the Task Force simply could not operate itself. (Doc. No. 95 at 18.)

Considering the amount of time spent performing first responder tasks and managerial tasks very slightly supports that Fidler's primary duty was managerial. In some cases, the "amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee." 29 C.F.R. § 541.700(b). However, it is not a useful guide here for three reasons. First, Fidler had complete control over his day-to-day activities. As Funk

---

[5] There was some reference at trial to the Assistant Director of the Task Force and a Senior Agent both assisting with supervising frontline investigations. (Doc. No. 94 at 127.) However, Fidler also testified that they could not supervise some of the Task Force's "activities." (Id.) There is no mention of anyone else assisting Fidler with his managerial duties.

13

testified, Fidler chose when to go out on investigations with his team. (Doc. No. 95 at 226.) However, this was not required, and a different Director may have chosen to let his team conduct investigations while he supervised from afar. Second, the Court does not find Fidler credible regarding the amount of time that he claims he spent on managerial tasks. As stated above, the Court finds that Fidler embellished, exaggerated, and focused on his law enforcement tasks while minimizing his managerial work. Third, all of the other factors indicate Fidler's primary duty was his managerial work, which minimizes the need for a specific finding regarding the amount of time he spent on each duty. See 29 C.F.R. 541.700(b) ("Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.").

The final two factors regarding Fidler's primary duty heavily (and obviously) indicate that his primary duty was managerial. He had complete discretion concerning his day-to-day tasks, and only reported what he was doing to the Board about five times in a year. He had no direct supervision over his daily tasks. Further, Fidler made about $20,000 per year more than Fox, an agent whose salary was consistent with that of Richard Hamilton, another agent. (D.'s Ex. 20 at 144.) The Assistant Director made approximately $10,000 more than the other Agents, but $10,000 less than the Director. (Id.) This salary indicates that the Board believed that Fidler's managerial tasks were worth approximately $20,000 per year. After weighing the applicable factors and the credibility of all of the witnesses, the Court finds by a preponderance of the evidence that Fidler's primary duty as Director of the Task Force was managerial.

2. Remaining Factors

14

Fidler regularly directed the work of two or more employees. He does not persuasively argue otherwise. Instead, Fidler avers that because the "agents knew what they were doing, how to do it, and when to do it," Fidler was not directing their work. (Doc. No. 98 at 12.) However, Fidler conceded at trial that if he and an agent disagreed, Fidler had the power to direct that employee's actions. (Doc. No. 94 at 126.) Both agents who testified at trial, Fox and Taylor, also testified that Fidler directed their work. (Doc. No. 95 at 38-39, 231-32.) The Court finds by a preponderance of the evidence that Fidler directed the work of at least two or more employees.

Likewise, the Board gave Fidler's recommendations particular weight as to the hiring and firing of employees or any other change of status. Fidler testified that if he discussed an applicant with the Board, he believed the Board would give his opinion particular weight. (Doc. No. 94 at 132.) Fidler's assertion to the contrary in his Proposed Findings of Fact flies in the face of his own testimony, and is simply not credible.

3. Conclusion

The Court concludes that Fidler was performing in a bona fide executive capacity as the Director of the Task Force. He is not entitled to compensation for his accrued compensatory time. 29 U.S.C. § 213(a)(1).

B. Fox

Based on all of the evidence at trial, the Court finds by a preponderance of the evidence that Fox is entitled to liquidated damages in an equal amount as his compensatory damage award. (Doc. No. 80 at 4.) Generally, an employer who violates § 207 shall be liable for unpaid compensation "and in an equal amount as liquidated damages." 29 U.S.C. § 216(b). Liquidated damages are "compensation, not a penalty or punishment." Elwell v. Univ. Hosps. Home Care Servs., 276 F.3d 832, 840 (6th Cir. 2002) (quoting McClanahan v. Mathews, 440 F.2d 320, 322

15

(6th Cir. 1971)). However, the Court has discretion not to award liquidated damages if it believes that the employer's violation "was in good faith" and the employer had "reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. The burden on the employer is "substantial," and if the employer "fails to carry it, the court may not limit or deny liquidated damages." Martin v. Indiana Michigan Power Co., 381 F.3d 574, 584 (6th Cir. 2004) (citing Elwell, 276 F.3d at 840).

Here, the proof at trial is that Fox's boss, Fidler, presented to the Board that Fox was entitled to compensation for his accrued compensatory time. Funk then asked Brook to investigate, who contacted Stewart. Stewart responded that Fox was exempt based on his job classification. No one else investigated Fox's claim. The Task Force failed to meet its "substantial" burden to prove that its violation of the FLSA was in good faith. Relying on a job classification does not establish that the employer acted in good faith. Martin, 381 F.3d at 585. Indeed, "the FLSA requires the employer to make FLSA exemption decisions based on the employee's actual job duties, not the employee's job title, and the good faith requirement imposes an affirmative burden." Id. at 585-86 (citing Ale v. Tenn. Valley Auth., 269 F.3d 680, 689-90 (6th Cir. 2001)). The Court finds by a preponderance of the evidence that the Task Force did not act in good faith, and the Court awards Fox liquidated damages.

The Court will enter an appropriate order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE